Thank you, your honors. May it please the court, David Sullivan for the state of Arizona. The petition in this case is untimely. It has been from the outset. And it needs to be dismissed on that basis alone. The district court's conclusion to the contrary is incorrect. It's incorrect under the plain language of the tolling provisions of the ed put. It's incorrect under the purposes of the tolling provisions for the ed put. It finds no support in Arizona law, and it defies common sense. First, the tolling provisions found in 2244D2 talk about during the time the postconviction proceeding is pending in the state courts, it's tolled. In this Celaya's case, her first PCR petition was pending until the Arizona Court of Appeals issued its decision and denied her PCR relief. At that point, she chose not to seek further review. Because she submitted no further pleadings, because she submitted nothing beyond that point, there was nothing pending before the court. And because there was nothing pending, there were no further decisions to be made. Why is it not pending so long as she has the option of coming back to that court? Well, I think under the language of the ed put, when we compare it to the tolling provisions versus D1A when we're talking about the direct appeal, direct appeal is specifically included. The time for seeking review and things like that are specifically mentioned in the statute. But under the tolling provisions on D2, there is no mention of that. And so we just have the word pending. Correct. However, even if we were to look beyond that, I think the Court's hit on a good point, is if we were to look beyond the dispositive ruling by the State court, then the proper time to end the tolling would be at the time for seeking review, not the time the mandate issues. Go ahead. Go ahead, Jim. I mean, that's just an odd construction from our practice, because jurisdiction doesn't transfer until a mandate's issued. The Supreme Court's made a big deal about the mandate issuing. It's still we view the case as within our jurisdiction subject to further review until a mandate issues. Can you tell me that there's a provision in Arizona that makes that different? I mean, the Court of Appeals could withdraw the opinion before the mandate issues. So why isn't it still pending? I just don't get that. Well, it's not pending because once the time for seeking review has expired, there's nothing left. There's no procedural mechanism for the defendant to bring the claims back to the appellate court. So because there's nothing left to do with the case, if we were to go beyond the decision to do that. But the Court itself is not yet stripped of its jurisdiction until the mandate issues, and then we look in these Arizona cases where they keep talking about, you know, the judgment and the mandate and the mandate. So admittedly, it's murky, but why shouldn't it be the mandate so you'd have a fixed time, because otherwise the Court of Appeals or the Supreme Court could step in still? Well, the problem with looking to the mandate under the Arizona rules is that there is no requirement for a mandate under the Rule 32. Rule 32, which is the rule that governs post-conviction proceedings in Arizona, simply says that when the matter is determined, the record is to be sent back to the lower court. So there's no specific provision for a mandate. And in fact, the parties have agreed that there are many cases in Arizona where a mandate is not issued during post-conviction proceedings. So if that's the case, we can't look to a mandate where that may not issue. And again, you know, this is undisputed between the parties, that there are cases where a mandate will not issue. Could you describe the practice under which a court of appeal in Arizona decides whether or not a mandate is appropriately issued? Honestly, I cannot. I have looked at that and I have not been able to determine a particular rhyme or reason. It seems to me, after reviewing the cases, that when a silent denial is issued, typically a mandate will not issue. And when the court of appeals decides to write separately from the trial court and decide, based on further review, that a mandate will issue, that seems to be the pattern. That's what it seemed to me. Well, it's unusual, and I want to make sure that we're communicating correctly, because in our court, it's very much a live issue until a mandate issues. We can take responding action. We can, in fact, to preserve the right to do that, we have to instruct the court to withhold the mandate. So it's very, very much a live question. And it seems to me, until something issues from the court, they still have, it's still pending in front of them until jurisdiction transfers back. Well, again, I think that that would be true in cases where a mandate is required. But we simply don't have a provision for a mandate under Rule 32 in Arizona. And because we don't have that, and because we have parties who agree that there are plenty of cases where a mandate doesn't issue. But we don't know what the governing principle is. I'm sorry? We don't know what the governing principle is except for anecdote. Honestly, I have not been able to find anything that says one way or the other. You would look to the rule, then, for your distinction as to how it's phrased. Yeah, that's correct. Under the rule itself, it simply says when the matter is determined, return the record to the lower court. And that doesn't require the issuance of a mandate or any type of ‑‑ Well, in a case in Arizona where a mandate is issued, I'm trying to figure out, then, what's a habeas petitioner supposed to do in terms of calculating time? I guess if no mandate is issued, then the time of decision or maybe the time of expiration of possibility of appeal. But if a mandate is issued, that's a pretty clear signal that in that case that court of appeal thought it had jurisdiction until issuance of the mandate. So what we're doing is not trying to predict in advance whether a mandate will issue. We're trying to figure out what's the time running or the tolling when we have a mandate. And here we have a mandate, and so we're working forward, trying to figure out what's my timeline, knowing that I've got a mandate. Yes, sir. I believe the court's question can be answered by keeping in mind the purposes of the tolling provisions under the ad hoc. The Supreme Court has told us, even as recently as last year, that the chief purpose of the tolling provisions is to allow for the exhaustion of state remedies. And we want another purpose is to encourage the exhaustion of state remedies, to encourage, you know, litigants to take care of these claims and raise them. So those purposes are served when the time for seeking review has expired, because at that point there are no more procedural mechanisms. No, but I think Arizona operates in this sense roughly as we do, which is to say if there's going to be a case in which there's going to be a mandate in Arizona, which for us there always is a mandate, until the mandate issues you can seek review with us back in this court. So we're not talking just about appellate review. We're talking about reconsideration. When the mandate comes down, as you probably know, in this court, that's serious business, and it's very difficult to find a justification for reopening once the mandate's come down. So it's entirely consistent with the purpose of AEDPA, as you've just described it, to facilitate and encourage state court review to say that it's pending until the mandate has come down, because you can get review not necessarily on appeal, but you can get review by the court of appeal of the decision it has already come out with. Well, unfortunately, in Arizona, we're back to the rules being, I guess, as the courts described, a little murkier, where we don't have a mandate, and the rules do say that the time for seeking review expires, and the mandate, then, is the time for seeking appellate review. Yes. Can I shift gears, because I don't want all the time to go to the timeliness. I have a question with respect to the AEDPA review, because we have a state court here that rules only on the evidentiary question. In your brief, you said, you know, we go to AEDPA, we go to deference. But if the state court didn't rule on the constitutional question, we normally would look at that constitutional question de novo or fresh. My question is, in doing that, do we owe any deference to the state court's evidentiary ruling? Or how does that fit in? I haven't found cases that have this precise situation. I think that that would probably turn on a couple different factors. If the claim was even raised in the state court, such that the court was never presented with that claim, I'm not saying that that was the case here. I'm just saying as a general proposition, if the claim was never raised, the court would never be given an opportunity. So that would be not a cognizable claim under the AEDPA. And I think that if we ---- Well, that would be a non-exhausted claim. It would be defaulted, exhausted, or whatever. Correct, Your Honor. But let's assume it's raised like it was here, but the state court just doesn't comment on that point. So then we're in the, you know, AEDPA land where we can't give deference on this constitutional ruling. We need to make it ourselves. My precise question then relates to what do we do as to the underlying evidentiary issue, and how does that fit into the constitutional issue? I suppose under those circumstances, the court's review would have to be de novo because if the issue was preserved but there was never a ruling upon the issue, I think that then the review would be de novo. De novo of what? Under the record as it exists at the time. No. In other words, should we go back? I mean, because if there's an evidentiary reason that witnesses might not have been able to be presented because of reliability or time lag or a whole variety of things, do we go back and redo the 404, you know, the 401, 304 analysis? No. No. I think that's the question. Then you're maybe misunderstanding my question. Okay. I mean, I know as a matter of right we can go back on the constitutional question. My question is how does the state evidentiary question fit in there? Because the whole issue here really relates to whether or not those witnesses should have testified. And if they should have, you know, would it have changed, you know, the outcome or had the probability of changing the outcome? Well, under the AEDPA, if I'm understanding the Court's question correctly, the review would simply be whether or not due process violated fundamental notions of fairness. The law seems to be fairly well established that the courts on habeas review do not look at the specific evidentiary rulings of the state courts because those are state evidentiary rulings under state law. So the review is limited to fundamental fairness under the due process clause. And in this case, the state would respectfully submit that the fundamental fairness was met because of the nature of the testimony and the availability of these witnesses. We had a bartender who gave wildly inaccurate information about dates when this victim could have been in the bar. Carranza? Is that Carranza? That's Mrs. Zybora, I believe is how you pronounce it. So much of her testimony couldn't be reconciled with things we know about the victim when he could have been in the bar. And there was a lot of, it was very remote. This was six years prior. Yeah, yeah. You picked on the one that's the weakest. The other two look, the other two witnesses, I don't see much reason for keeping them out. And keeping them out really prevented her from putting on the defense that she was trying to put on. I mean, she made the argument, but she didn't have any witnesses that would help very much. These witnesses would have been extremely helpful. Yes, Your Honor. The second witness, Ms. Dolan, or an AKA with Ms. Carranza, just very briefly, she did say that he initially scared her and that he had taken her to a spot in the desert to transact business. But she also indicated that she continued to date this individual eight to ten times after the initial date. She indicated that he gave her a ride around town. Right, but that's cross-examination. Were you also unsure about whether he was the victim? I'm sorry? Was she unsure? She was pretty certain. I think she said that she was very sure. She equivocated just slightly, but she did seem to indicate that she was pretty sure. And then the third witness was Ms. Larivas. She wasn't able to offer any type of reputation. She did have an opinion. Unfortunately, there was some remoteness problems because the incident that she was describing had occurred three years before the incident in question. And another problem, speaking of fundamental fairness, though, is that she was not available for trial. And at one point, defense counsel even admitted that they had done nothing to locate her for eight to nine months. The state was never given an opportunity to interview her, to check her testimony, do any kind of investigation there. So excluding her under fundamental fairness I don't think would be a problem. So you said unavailable for trial? I'm not sure that's exactly what you meant to say. There was a suggestion in the record that she may not have been unavailable at trial, that she was certainly not available as of three months before trial. The trial court didn't make that finding, though, did it? I'm sorry? The trial court did not make that finding of unavailability. No, not that I'm aware of. Thank you. Thank you, Counselor. Share in the record. Thank you. Well, it's good of you to share the record. We congratulate you both. Sorry to take your time. Yeah. Thank you. May it please the Court, my name is Bill Kirshner. I represent the petitioner in this case, Gina Celaya. As you know, Gina Celaya was at the time the youngest person ever tried for first-degree murder in Pima County. She was facing the rest of her life in prison, which is what she got at a trial where she was not allowed to present the evidence that would have at least created a reasonable doubt, if not proven to the jury, that she was, in fact, defending herself at the time of these events. Now, the first issue that the State has addressed is the question of whether there is statutory tolling during the time that the PCR proceedings were in process. The critical issue being whether the appellate case was still, quote-unquote, pending until the mandate issued. And I think it's very clear that it was pending. It was not only the conclusion of the magistrate judge and the district court judge, but also the Eleventh Circuit, the Eighth Circuit, and the United States Supreme Court has said as much in Holland v. Florida. Obviously, that's dependent on Florida law, but it's really indistinguishable from this case. So I think it's very clear that statutory tolling was in effect here until the time it was mandated. But we have two different rules. I mean, if we look at – it's all Arizona law, so we don't look at these other states. And we have a very distinct difference between the wording of the criminal rule 31 and rule 32. So if you give any meaning to it, rule 32 doesn't reference the mandate, correct? That's not strictly correct. Rule 32.4, which is not exactly on this point. On point. It is a rule about when the defendant can file a second PCR. Correct. And it specifically says – it bases one of those times after the issuance of the mandate from the first PCR case. So clearly, rule 32 does envision cases where a mandate would issue as it did in this case. But that really relates to a second petition. Right. But it is at least envisaging the fact that mandates do issue. And it is the practice. It is certainly what happened in this case. And as the Court was discussing before, there's no evidentiary ruling in the record as to what the courts of appeals do. But as a practicing attorney, I can tell you, and, you know, I don't know if this is a fair game for me to tell you. I don't think it's a fair game, but you might have had somebody put that into the record in the district court, for example. I mean, that seems where it would be appropriate, where you would have someone explain the Arizona practices. So I don't think you can do that ad hoc on appeal. I understand what you're saying, and that probably would have been better done. Would you agree with the State that the mandate practice on Rule 32 motions is inconsistent in Arizona? Yeah. The mandate practice, I think, is clear, and that is when the Court accepts review, when the case is done, they issue a mandate. And when the Court does not accept a review, they simply issue a decision denying review and no mandate issue. So that's because the Court never accepted jurisdiction. They never had a case. I see. So basically your position is they accepted review in this case. Therefore, the mandate provisions of Rule 31 kicked in, and they, in fact, issued a mandate. That's exactly our position. Yeah. Okay. And because the mandate did issue in this case, because all of the case law says that it's the date of the mandate, I think that the petition was certainly timely in this case. And I think the easiest way of looking at this is if there was — if the case was no longer pending, there would be no reason to have issued a mandate, which is, in effect, the order of the Court. I'm not sure whether the Court even would have had jurisdiction, but certainly there would be no reason to issue that final order. Could you — would this potentially — would this potentially leave you in a situation where, you know, this may give some precision for your client because there's a mandate, but then we wouldn't know what would happen with people who don't get a mandate? I don't see how that would be a problem, because if the mandate ever issues, the only way to do it is to wait. How do you know? I'm waiting, I'm waiting, I'm waiting for the mandate. Whoops, it never issued. I mean, if I'm somebody who does — is in a case that's not mandated, how will I know when to file? Well, two ways. First of all, you would receive the letter from the Court saying that we've denied review, and they would return the file to the superior court, and that would end the case. And all of the practicing attorneys in Arizona know that. So they know where the case ended. So do you count from the date of the letter or the date the file is returned? I mean, in listening to the State's argument, I was thinking, well, maybe it's the date the file is returned in those cases. I think the Hemerly v. Shryro case actually addresses that, and I believe it says that it is the date that the decision comes down. When the mandate's not issued, okay. Right, so in the — In the decision denying review. Exactly, exactly. And if I could just briefly touch on the fact that I think there's also an equitable tolling argument to be made here, that both the district court and the magistrate judge have — equitable tolling would apply in this case. And, you know, I would like to just say very briefly there's only two requirements for that. One is that the defense have been diligent. The other is that there be an extraordinary circumstance. I think the extraordinary circumstance, it's outlined in the briefs, but it has been reaffirmed in this court in the last couple of weeks in the Neds v. Calderon case, in which it says that if the law at the time that the petition is filed is a certain way and later on changed that that is the extraordinary circumstance necessary for equitable tolling. And the only other thing that you need to have is diligence on the part of the defense. And diligence was certainly there in this case. You know, the state's argument has been that we should file motions for reconsideration, all those things. I think that's the exact opposite of diligence. What you don't want is to have the defense dragging out and prolonging the proceedings. What you do want is for them to expeditiously exhaust their issues in the state court. And as the Supreme Court has said, what's required is reasonable diligence, not maximum feasible diligence. So in this case, there was reasonable diligence. The district court specifically found that. And so for either reason, I think that the issue, the petition in this case was timely filed. Would you address the merits of the three witnesses? Yes. And do you agree with counsel for the State that we wouldn't really march through an evidentiary analysis, but we would just look in some broader sense to determine whether due process was violated? Or how is it that you see we would analyze this on appeal, given the state court didn't look at the constitutional question? Well, to be perfectly candid with the Court, I can't cite you any case law on that. But I believe what would be the correct thing to do would be de novo review, which is to not give deference to the Court's evidentiary decisions, but to look at the matter for yourself and see what you think of the matter. And when you say look at it for yourself, though, would we look at it in light of the trial court again, in effect? Or are we looking at it at some broader construct over here that doesn't really relate to the evidentiary rules? The evidentiary rules that a State has certainly can and should be applied in. I think you would have to think those through. And there's an excellent Arizona Court of Appeals case that's discussed in the briefs, the Fish case, the talks. It's so close that the district court said it was on all fours in this case. And it talks about that. But there's also just the question of how much credibility there should be given to these witnesses. And the State has selected portions of their testimony and said, well, this doesn't match up, or this person has a bad memory, or they've committed crimes and so forth. But every day in this country people are tried and convicted on the basis of witnesses that have dirty histories and have done wrong things. Usually they're states. Well, let's just assume they all have a little dirt in their background, which is your average person in the world. Right. So the question I have, though, is when you look at whether you're going to permit a witness to testify, there's legitimate concerns about does it even rise to the level of reliability, how close a connection, what's the time. And those are all decisions, of course, that are made usually by the trial court. And here you have some very definite, you know, remoteness and relationship issues that would legitimately preclude them from testifying, or at least one of them, possibly two. So I would appreciate your analysis of why not having them testify, if there's legitimate reasons under State evidentiary law, would somehow rise the level of due process violation. Well, I think the answer to that is that there weren't legitimate reasons under State evidentiary law for them not to testify, and that the general principle the Court is well familiar with is that the problems that these witnesses have go to the weight of the evidence and not to the admissibility of the evidence. These witnesses were all sure that this was the man that they were talking about. Certainly, the trial court has a gatekeeping function to keep out evidence that's irrelevant, to keep out evidence that is talking about someone else. But it is up to the jury to decide the credibility of these witnesses. And in each of these cases, the witnesses said, I know that is this man. Ms. Carranza, I believe, was the witness who gave the two statements. And she said that she had gone out with this guy several times. She recognized him from the pictures. She gave accurate descriptions of the truck he drove, the hat he wore, all of these sorts of things. She knew this was the man, and she knew something else that was really important about this fellow that was critical to the defense case. And that is his peculiarities, shall we say, when he took women out like this. He didn't just take them to the hotel room where they wanted to go. He took them out to the desert. She said he took them out to a wildcat dumping area near the Tucson Airport. That's at least an accurate description of where he took Gina Celaya. She said that he would follow them along South 6th Avenue and pick them up. That's what Gina Celaya said. And most importantly, she said that he scared the heck out of her. She's a 40-year-old prostitute. She could handle herself out in the streets. Gina Celaya is a 14-year-old Native American girl, never committed a crime, well, never committed prostitution. Anyway, she had some juvenile incidents. But someone who, when confronted with that frightening behavior in the dark of a desert, in the middle of nowhere, would feel that she has to defend herself, would feel that she is being attacked, and that would have told the jury why she took the actions that she took. And, you know, when you want to talk about how a person behaves when he's with prostitutes, the witnesses are going to be prostitutes. They're going to be people who have dirty backgrounds and drug history and so forth. And, yes, you can get them to say, gee, I don't remember this or, you know, those kinds of things, all of which would be fair game for the prosecutor to cross-examine with. But it's not a reason to keep those witnesses off. If we did, we would keep off the state's witnesses in so many cases where they also have reasons to testify and drugs in their background and so forth. So these witnesses were crucial to the defense, not only to establish that this man picked her up voluntarily. So just to be clear, it doesn't come in as M.O. evidence, correct? I'm sorry. It doesn't come in as M.O., modus operandi evidence? No. That would not be permitted? I don't think modus operandi would be the correct category. I think the correct category is motive, intent, common scheme and plan. There was also a certain amount of evidence that testified to his reputation in the community. There was not much that his ---- Well, I thought the character, I thought there was, you know, the character evidence wouldn't come in except in mort as a rebuttal, correct? I don't think so. I think the character of violence could come in in the defense, in the defense case in chief. And, you know, that is what the ---- Well, would that be permitted under the evidentiary rules if the character hadn't been first implicated? Well, if you're ---- I'm just asking. I don't think so. I don't think that that is correct. I think that the defense is entitled to show that the decedent had a violent character. But one way or the other, I think it was implicated here where ---- And at some point I would think that I'm not so much interested in the precise application of the Arizona evidentiary rules as a gestalt question as to whether or not this is evidence that would be helpful to her defense. I mean, we're not talking about convicting him of anything, which is why we have a lot of these rules about character, propensity, and so on. We're talking about whether or not her story is true. And this would have shown that, and this would have given the jury at least a reasonable doubt to believe. Well, correct me if I'm wrong, but wasn't there testimony presented by the state that indicated he was sort of an uncle figure, a good guy, that they put his character? I don't want to take that too far. I think they did talk about his grandchildren, and they had his wife testify, and she talked about him a little bit. They didn't really put on specific good, peaceful testimony, so I don't want to mislead the court. But there was enough there, talking about his grandchildren and so forth, setting it up where you would think this guy would never do such a thing. Well, here were witnesses that said he did, and it was crucial for the defense to put those on. And keeping those off denied this young lady her right to present a complete and meaningful defense, and that's why we would ask that this court affirm the district court's decision to grant the writ of habeas corpus in this case. Thank you, counsel. Thank you. Rebuttal? Put two minutes on? Yeah. We'll give you two minutes. Thank you. I'd like to provide the court with an example about why we can't extend tolling to the mandate. To say, for example, a defendant would seek PCR relief in the trial court, it's denied, and then doesn't seek review by any appellate court. Well, under the Arizona rules, it's only the appellate courts that issue the mandate. Because this PCR petition was never presented to an appellate court, there will never be a mandate issued. Under those circumstances, under the district court's ruling, if we extend tolling all the way out to the mandate, we've now just indefinitely extended tolling because there never would be a mandate. Well, when a mandate's actually issued, why don't you measure from the mandate? I'm sorry? When a mandate's actually issued, why don't you measure from the mandate? I understand your speculative concern, but when the court actually issues a mandate, then you have a marker, don't you? That may be true, but the problem is now we run into inconsistencies. On the one hand, this individual will have tolling well beyond the tolling that was extended to this other individual. We run into inequities where ---- But isn't that the question for the other case, not this case? No, I don't think so, because the tolling in this instance really has to cut off at some point. And if the purposes of the AEDPA are to interact with tolling, with exhaustion and things like that, going out to the mandate simply doesn't make sense. Not only will it put different prisoners in inequitable positions, but it also would deter prisoners from diligently seeking their rights by trying to stay within state law time. Let me make sure I understand when you say comparison with that other case. What's the other case that you're hypothesizing? You said it, but I'd like you to say it again, so I'll make sure I get it. I was providing a hypothetical. Yeah, I know. What's the hypothetical? The hypothetical would be the defendant seeks PCR relief and the trial court loses and never appeals to any other court. Again, we've got an analogy in federal practice. Federal trial courts don't issue mandates. They issue judgments. So you never wait for the mandate from the trial court because you know you're never going to get one. And I assume Arizona has something like that. You look at the judgment of the trial court, that's it. Boom. But, again, if we're looking at the state laws to determine when the tolling starts and ends. No, we're trying to figure out when is a court done with the case? When is it no longer pending before that court? In a trial court, it's obvious when the judgment issues and the jurisdiction is lost. In the appellate court, at least if we have a mandate, we know that the appellate court has transferred jurisdiction back to the state court. Now, the distinction drawn by your point, which I'd like you to address if you can, is that, look, if they aren't going to accept jurisdiction, they don't issue a mandate. When they do accept jurisdiction, they do issue a mandate. Do you agree with that characterization of Arizona law or not? Again, unfortunately, I don't have any information one way or the other on that. I don't have any statistics or any case law I'm going to say one way or the other, other than just to refer again to anecdotes between counsel and I that it seems to be the case where if denied, if they deny review, a mandate does not issue. But if the court then decides to write separately from the trial court's decision, a mandate will often issue. Well, so it wouldn't be unclear if you are a petitioner and you get a note back from the court of appeals denied, send this back, you know, send the record back, that there's nothing more to be done, right? Whereas if they accept review, then you've made a pretty good dichotomy because they're not denying review. So once they deny review, well, that's it. So it seems that there is, either in practice or even the way the State procedure works, that there really is an easy way to figure it out. It just depends on which box the petitioner falls in. So why wouldn't that be predictable? Well, I think that if we look at the time for seeking review and set the tolling provision at that point, we have served that purpose. We have now, again, keeping in mind that the tolling provisions are supposed to encourage exhaustion and work hand in hand with exhaustion. If we extend tolling beyond the time for seeking review, we are now extending tolling into a period where the defendant can't present any further claims, where the State can't present any further claims. The litigation is over. There are no more issues to decide. Well, I'm sorry to interrupt, but it seems if the court itself can act, then it's not exhausted for State purposes. In other words, if the court of appeals say, look, wait a minute, we're going to withdraw this case. The mandate hasn't issued. We have further work to do, as we do sometimes when we see an error in an opinion or something like that. You know, that's not exhausted. So those purposes aren't served. It seems to me, and you can correct me if I'm wrong, and I'm trying to struggle with analogies, but in our court, for example, if there's a request for a writ of mandate, a writ of mandamus,  We either deny the writ or we grant the writ. No separate document. When there's an appeal where we have jurisdiction, we do issue a mandate. From what counsel says, there seems to be sort of an analogous custom in Arizona, but we just don't know from the record. Yeah. Unfortunately, I can't point you. Well, we've been hoping for years you guys would clean up Rule 32. Me?  I don't blame the court. It would be nice if it was clarified. Our questions have taken over your time. Is there anything else you'd like to point, you'd like to make briefly? Just very, very briefly, the fact that if a court, an appellate court, decides to deny review, a silent denial versus writ separately from the trial court, that doesn't convert it somehow into any type of other proceeding. It's still Rule 32 proceeding, so the mandate requirements under Rule 31 that govern direct appeals wouldn't apply. And also the equitable tolling argument. I would just briefly say that I understand that counsel was faced with a very large record and he worked very hard on it. However, I would say that that's not the only thing to keep in mind. We should also keep in mind that Ms. Saleh waited until seven months into her EDPA timeline to take any action to begin these proceedings. She did the secret review by the Supreme Court. And I understand that counsel probably worked very hard on that, but I'm sure that counsel, in all the cases where equitable tolling was denied, worked very hard on those cases. And I'm not sure that working hard on the case and doing your job as a zealous advocate for your client is really enough to grant equitable tolling. Okay. Thank you, counsel. Thank you. Thank you, both, for your arguments. The case has certainly been submitted for decision, and we appreciate your collegiality toward each other as well.
judges: Thomas, McKeown, Fletcher